36 F.3d 1115
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
MATSUSHITA ELECTRONICS CORPORATION, Plaintiff-Appellee,
v.
LORAL CORPORATION and Loral Fairchild Corp., Defendants-Appellants.
 No. 93-1435.
 United States Court of Appeals, Federal Circuit.
 Sept. 13, 1994.
Rehearing Denied; Suggestion for Rehearing In Banc Declined
Nov. 8, 1994.
 
 Before ARCHER, Chief Judge, COWEN, Senior Circuit Judge, and NIES, Circuit Judge.
 NIES, Circuit Judge.
 
 
 1
 The sole issue in this appeal is whether Matsushita Electronics Corporation (MEC) holds a license under U.S. Patents No. 3,896,485 (the '485 patent) and 3,931,674 (the '674 patent) which would negate the charge of the appellants (collectively "Loral") of infringement by MEC and its customers. On cross motions for summary judgment the United States District Court for the Southern District of New York ruled in favor of MEC. We affirm.
 
 I.
 
 2
 MEC claims it became a sublicensee under the '485 and '674 patents prior to Loral's acquisition of them. In the late 1960's, Fairchild Camera and Instrument Corporation, through whom Loral claims title, entered into two separate agreements with N.V. Philips Gloeilampenfabrieken. The first, a "Patent License Agreement" provided for the cross-licensing of the two companies' existing patent portfolios. In a second contract, the "Technical Exchange Agreement," effective November 1, 1969 (hereinafter "the Exchange Agreement"), Fairchild and Philips agreed to a broad, prospective exchange of technology and patent licenses. Loral has conceded that the two patents in issue, the '485 and '674 patents, relating to electronic components known as charge coupled devices, fall under the Exchange Agreement. Under the agreements, Philips had the right to grant sublicenses of equal or lesser scope than it had obtained to MEC, an electronic equipment manufacturer organized by Philips and Matsushita Electrical Industrial Company (MEI). In a December 15, 1969, letter (hereinafter the "Letter Agreement"), Philips summarized these agreements and expressly offered MEC a sublicense, which MEC accepted. The parties dispute the scope of this license.
 
 
 3
 Loral was assigned the '485 and '674 patents in 1989. MEC accepts the validity of that assignment for purposes of summary judgment. In 1991, Loral brought an infringement action against a number of defendants in the United States District Court for the Eastern District of New York. Several of MEC's customers, including MEI, were among the accused infringers.
 
 
 4
 On July 22, 1992, MEC initiated a suit against Loral in the District Court for the Southern District of New York, seeking a declaratory judgment confirming that MEC had obtained a sublicense under the asserted patents. Loral counterclaimed for patent infringement. On May 21, 1993, following discovery and the submission of motions for summary judgment by both parties, the district court granted MEC's motion and denied Loral's cross-motion, holding "that MEC was in fact licensed by Philips pursuant to the various agreements with Fairchild." Loral appeals.
 
 II.
 
 5
 Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Paragon Podiatry Lab. Inc. v. KLM Lab. Inc., 984 F.2d 1182, 1184-85, 25 USPQ2d 1561, 1563 (Fed.Cir.1993). As the moving party, MEC bears the burden of establishing that it was a sublicensee under the asserted patents. Conroy v. Reebok Int'l. Ltd., 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). On appeal, we do not defer to the decision of the trial court, but instead determine the propriety of a grant of a motion for summary judgment de novo, as a matter of law. International Visual Corp. v. Crown Metal Mfg. Co., 991 F.2d 768, 770, 26 USPQ2d 1588, 1590 (Fed.Cir.1993).
 
 
 6
 There is no dispute that Philips obtained the right from Fairchild to grant sublicenses to MEC. The dispute is over whether the Letter Agreement effected a sublicense to MEC of the '485 and '674 patents. Because contract interpretation is a matter of law, Intel Corp. v. ULSI Sys. Technology Inc., 995 F.2d 1566, 1569, 27 USPQ2d 1136, 1138 (Fed.Cir.1993), and "[i]n contract interpretation, the plain and unambiguous meaning of a written agreement controls," Craft Mach. Works, Inc. v. United States, 926 F.2d 1110, 1113 (Fed.Cir.1991) (citation omitted), summary judgment is a particularly appropriate vehicle for resolving this litigation.
 
 
 7
 On appeal, Loral offers three reasons why MEC holds no license under the '485 and '674 patents and a fourth argument against any extension to MEC's customers. We address each of its arguments in turn.
 
 
 8
 Loral first asserts that the Letter Agreement between Philips and MEC never made an affirmative grant of a license to MEC except in Part I respecting pre-1969 patents. We disagree. As MEC notes, Part II of the Letter Agreement specifically referenced the Exchange Agreement respecting future patents and provided in conclusion:
 
 
 9
 In case you are interested in being sublicensed ... as set out above you are requested to return to us the enclosed copy of this letter duly signed on behalf of your Company as proof of your acceptance of the conditions set forth herein.
 
 
 10
 Evidence of record establishes that the Letter Agreement was in fact executed and returned. There is simply no genuine issue on this point. Additional documents, testimony, and a course of dealing between the licensor Fairchild, the licensee Philips, and MEC over the years corroborate the conclusion that MEC was a sublicensee of post-1969 patents, including the two in issue, as well as earlier ones. Although Loral further asserts that a license must provide express details as to its scope for it to have legal effect, we know of no authority which so holds and, in any event, disagree. Under Article V of the Exchange Agreement, Philips obtained licenses under "New Patents" of Fairchild which included the '485 and '674 patents and, absent restrictions, Philips' sublicense to MEC was of the same scope as Philips' license from Fairchild.
 
 
 11
 Next, Loral argues that MEC did not fulfill the requirements of Article VII, section 1(c) of the Exchange Agreement, which provided:
 
 
 12
 The parties hereto shall have the right to grant to any of their Affiliated Companies and 100%-owned subsidiaries of their Affiliated Companies licenses and releases of the same or lesser scope than the licenses and releases granted to the parties hereunder, provided that the company receiving such license or release shall, in consideration of said grant, grant to the other party licenses and releases of the same scope as the licenses and releases hereunder granted by the parties.
 
 
 13
 Loral asserts that MEC never granted back to Fairchild a corresponding license. Once again, the executed Letter Agreement plainly establishes that MEC did grant such licenses. Section I(e)(1) of the Letter Agreement, concerning the 1968 "Patent License Agreement," explicitly noted that:
 
 
 14
 You will subject to the above Patent License Agreement all patents on products referred to under a) above issued on inventions first filed before the effective date of the Agreement and/or filed within a period of 5 years thereafter.... This means we shall have the right to grant to Fairchild under such patents a free non-exclusive license [sic] and release with respect to the past.
 
 
 15
 Section II(k) of the Letter Agreement then provided that, with respect to the Exchange Agreement, MEC would obtain patent licenses if it agreed that "the conditions referred to under I paragraphs (e) and (f) shall equally be applicable." By agreeing to the terms of the Letter Agreement, MEC thus subjected its patents to the "grant back" rights required under the Exchange Agreement. There is no dispute between the parties to the agreements that Fairchild held licenses on MEC patents.
 
 
 16
 Third, Loral argues that, in any event, any sublicense rights possessed by MEC were later extinguished because Philips gave up effective corporate control of MEC in the early 1980's. This assertion has significance because Article I of the Exchange Agreement, which defines the "affiliated company" upon which status MEC relies, included a requirement that
 
 
 17
 such party [Philips] shall have effective control of any such entity [MEC], or at least in practice be in a position capable of preventing a significant decision being made with respect to the activities or operations of such entity in contravention to the wishes of such party.
 
 
 18
 It is conceded that Philips relinquished control over the daily affairs of MEC by 1983. The evidence of record manifestly establishes as well, however, that Philips retained sufficient power to prevent significant decisions from being made by MEC. MEC's Articles of Incorporation granted Philips the absolute right to subject any planned action to a shareholder's meeting. As any contemplated action would then have to be approved by the unanimous consent of all shareholders, including Philips, Philips retained an effective veto right over any action contemplated by MEC. We also note that Philips' subsequent agreement with MEI specifically states that "the rights of shareholders under the Articles of Incorporation of MEC will be maintained." Reviewing the entirety of the evidence, we conclude Loral has failed to show that a genuine issue of material fact exists on this point.
 
 
 19
 Finally, Loral contends that Philips had no authority under the Exchange Agreement to extend license protection to MEC's customers even though Article VII provided that "affiliated companies" such as MEC could be granted a license of the same scope as the license granted to Philips whose customers were protected. Loral's argument is based on Article V of the Exchange Agreement, which provides that the contracting parties would not bring infringement suits against customers of the parties or their "associated companies." Because Article V did not mention "affiliated companies," Loral argues that any sublicense to MEC cannot be read to protect MEC's customers from infringement liability, in effect, that MEC could sell to Philips only. However, nothing in Article V restricts Philips' authority to grant rights equal to its own to an affiliated company. We decline to construe Article V to create a limitation on the express language of Article VII by a tenuous negative inference. Moreover, we read Article V to insure that customers of Philips were protected from infringement suits by Philips' license. By Philips' grant of a license of equal scope to MEC, MEC customers are similarly protected. MEC has also demonstrated that the contracting parties understood the license to MEC was of sufficient scope to protect MEC customers from infringement liability.
 
 
 20
 Under these circumstances, we again agree with the trial judge that the evidence of record creates no genuine issue regarding the scope of MEC's license.
 
 III.
 
 21
 We have considered all of Loral's other arguments and find them equally unpersuasive. MEC is entitled to the judgment in its favor as a matter of law.